FLETCHER vs. INGRAM and others.

SALE OF CHATTELS: BAILMENT. *(1) Rule as to delivery of chattels to pass title. (2) Case stated. (3) Who a bailee, with right to notice of sale. (4) Case stated.*
PARTNERSHIP: PLEADING. *(5) Liability of firm for acts of one partner. (6) Case stated. (7) Whether answer raises question of defendants' joint liability.*

1. On the question whether chattels were delivered so as to pass the title (in this case lumber in cribs), the settled rule in this state is, that if it clearly appears to have been the intention of the parties that the property should be deemed to be delivered and the title to have passed, and especially if their acts are inconsistent with any other view, the mere fact that something remained to be done will not govern such intention. *Sewell v. Eaton,* 6 Wis., 490; *Pike v. Vaughn,* 39 id., 500; and intermediate cases.
2. Pursuant to a contract of plaintiff with S. & L., he delivered logs at their saw-mill on the Chippewa river, for which he was to be paid a certain per cent. of the product in lumber, to be delivered at Reed's Landing, on the Mississippi river. After manufacturing a part of the logs, S. & L. failed in business; but they had already sawed and put into the Chippewa river, just below the mill, seven cribs of lumber for plaintiff in pursuance of said contract, marked with his name or initials; and the same were tied up with other cribs (belonging to S. & L.), ready to be run down to Reed's Landing; and, in answer to letters from plaintiff, inquiring whether his lumber was ready, S. & L. had answered that it was. Plaintiff then went to the mill, and L. told him that his lumber was manufactured, and went with him down the bank of the river, and showed him the seven cribs, and told him that they were manufactured and marked for him; and the amount of lumber in the cribs (somewhat less than was then due the plaintiff) was figured up between them, and

Fletcher vs. Ingram and others.

a bill of it made out, in which it was charged to plaintiff, and it was understood that the pilot employed by S. & L. would run it down to Reed's Landing for plaintiff, and deliver it to defendants' watchman there; and plaintiff requested defendants' book-keeper to do with the seven cribs just as they did with their own, at Reed's Landing — to tie it up and wait until the market rose, and then sell it as they thought best. *Held,* that it was competent for the parties to the contract to change the place therein fixed for the delivery of the lumber, and the foregoing facts show such a change, and an actual delivery at the mill.

RYAN, C. J., concurs on the ground, not that the facts show a delivery, as a matter of law, but that they were properly submitted to the jury.

3. To make one a bailee of property so as to require notice to him to complete a delivery to the vendee of the original bailor, there must be some special trust imposed upon him in respect to the property, and he must have some interest in or lien upon it for advances, charges or services; and he must have such possession, custody and control as to exclude for the time the possession of the owner, render him liable to the latter for loss occasioned by his (such bailee's) fault in the discharge of his trusts, and require a redelivery to the owner after such trusts have been discharged.

4. One M. had been in S. & L.'s employment, during the season, in running lumber down to Reed's Landing, and had in his employment, for that purpose, a crew of men, including a pilot, who was to run the cribs then at the mill down to Eau Claire, there to be taken charge of by M.; and M. was then at the latter city, making preparation to take such charge by making or repairing oars, and had receipted for the cribs, and had received a blank receipt, to be signed by the person who was to receive the lumber at Reed's Landing; but he had not actually taken possession of the cribs, which were still tied up to the bank, undisturbed, where S. & L. had placed them. *Held,* (1) That neither M. nor the pilot would have held the relation of a *bailee* to the property, even if actually in possession; but they were mere servants or employees of S. & L. (2) That the facts do not show them in actual possession. (3) That no notice to either of them, therefore, was necessary to a complete delivery of the property to plaintiff.

5. In commercial dealings within the scope of the partnership, the acts of one partner are presumed to be for the benefit and in the interest of all the partners, whether present or absent, and bind the firm.

6. The pilot in this case ran plaintiff's cribs to Eau Claire, and delivered them to M., who attached them as the property of S. & L., on an alleged indebtedness of the latter to him; and the cribs were sold to M. on execution upon a judgment in the attachment suit, and were by him

sold to P., one of the firm of I., K. & Co., the defendants (who were engaged in the manufacture and sale of lumber), and were paid for by a draft handed to M. by the book-keeper of the firm; and such cribs were then run down the river in connection with lumber of defendants (as part of the same raft), and with a steamer belonging partly to them, and were disposed of with their lumber to the advantage and profit of said firm. *Held*, that such purchase and sale of plaintiff's lumber must be treated, not as the individual transaction of P., but as a partnership transaction; and defendants are jointly liable for the conversion.

7. The joint answer of the defendants, after admitting their copartnership as alleged, denies generally the other allegations of the complaint. *Quære*, whether this was sufficient to raise the question of their *joint* liability for the conversion by P.

APPEAL from the Circuit Court for *Eau Claire* County.

Action for the conversion of lumber. The plaintiff had a verdict; a new trial was denied; and, from a judgment pursuant to the verdict, the defendants appealed. The case is stated in the opinion.

*Levi M. Vilas*, for the appellants, argued substantially as follows: If Saul & Lally had started this lumber on its way to Reed's Landing with the intention to deliver it to plaintiff there under the original contract, it would have been their property until delivered, and the sale of it by them to a third party, before such delivery, would have vested a complete title in the purchaser, even though he had known of their intention to deliver in payment of their debt to plaintiff. Benj. on Sales, §§ 377–9; *Mucklow v. Mangles*, 1 Taunt., 318; *Atkinson v. Bell*, 8 Barn. & Cress., 277. Plaintiff therefore shows no right to recover, unless the evidence was sufficient to warrant the jury in finding a complete and executed sale and delivery of the lumber to him made when he was at the mill. The testimony of Lally, and that of the plaintiff himself, shows that there was no talk whatever in regard to a sale or delivery there to the respondent. Neither mentioned the amount of plaintiff's logs which had been sawed, nor the amount of lumber due him therefor; nor does it appear that plaintiff had any

idea what that amount was. There is no evidence whatever that plaintiff requested a delivery of the lumber to him, or that Lally asked him to accept it, or that a delivery there was contemplated or desired by either of them. Before plaintiff's arrival there, Saul & Lally's pilot had received and receipted for the lumber to be run to Reed's Landing, and plaintiff was informed of this fact, and shown the bill of lading in the hands of the pilot, and knew that the lumber was to be run by Saul & Lally to Reed's Landing to be there delivered to him. Afterwards Lally went with him to the river near to where the lumber lay, and showed it to him " as the lumber mentioned in that receipt, to be delivered in that manner," as Lally testifies. Plaintiff says that Lally pointed out to him certain lumber as being his; but his own testimony shows that this was after he was shown the bill of lading, which informed him that Saul & Lally were about to run and deliver the lumber to him at Reed's Landing, which he approved, and that it was pointed out to him as the lumber mentioned in the receipt, marked to him, and to be delivered as required in the original contract. There can be no fair doubt that the whole conversation implied no more than an identification of the property specified in the receipt, and the property proceeded on its way to the place of delivery in every respect as it would had plaintiff never gone to the mill. How can a new contract be claimed in face of the fact that the original contract was left unchanged, in full force, to be executed according to its terms? To accomplish a delivery, there must be *acts*, and not mere words; and the acts relied on must have been done *for the purpose* of making a delivery *(Shindler v. Houston,* 1 Coms., 261; *Lester v. McDowell,* 18 Pa. St., 91; Browne on Frauds, § 326); and circumstances which are to be tantamount to an actual delivery should be very strong and unequivocal, so as to take away all doubt as to the intention. *Bailey v. Ogdens,* 3 Johns., 421. Under the original contract, Saul & Lally had the risk of running the property to Reed's Landing,

while, if there was a new contract and a delivery at the mill, plaintiff must have taken that risk. Benj. on Sales, § 693. But how can it be said, upon the evidence here, that plaintiff voluntarily assumed this risk, when nothing was said in regard to it, no new agreement was made or proposed, and the property was left to be delivered by Saul & Lally, and actually started for the place of delivery, in pursuance of the first contract? Moreover, if enough was proven to sustain the delivery as between the parties to it, it was insufficient as against other creditors of Saul & Lally, since there was no *apparent* change of ownership. *Menzies v. Dodd*, 19 Wis., 343; *Janvrin v. Maxwell*, 23 id., 51. Again, the pilot had received and held the lumber as agent of Saul & Lally, so that they had constructive possession; and, to transfer the possession to plaintiff, it was necessary to make the pilot *his* agent; and this could not be done without notice to and the assent of the pilot. Benj. on Sales, § 174; Browne on Frauds, § 318; *Boardman v. Spooner*, 13 Allen, 353; *Hatch v. Bayley*, 12 Cush., 27; *Hatch v. Lincoln*, id., 31; *Carter v. Willard*, 19 Pick., 1; *Jones v. Bradner*, 10 Barb., 193. The facts being undisputed, the court erred in denying defendants' motion for a nonsuit; and it further erred in instructing the jury to disregard as immaterial the evidence of the delivery of the lumber to the pilot, and that " it was competent for Saul & Lally to sell and deliver their property in the hands of their pilot, without his knowledge or consent." 2. The firm composed of the defendants is not liable for damages arising from the unlawful act of one partner, outside of the partnership business, done without knowledge or subsequent adoption of his acts by his copartners. Waterman on Trespass, § 52; Collyer on Part., § 457; *Graham v. Meyer*, 4 Blatch., 129; *Heirn v. M'Caughan*, 32 Miss., 17; *Taylor v. Jones*, 42 N. H., 25.

For the respondent, there was a brief by *Henry H. Hayden* and *Wm. P. Bartlett*, and oral argument by *Mr. Hayden*. They contended, 1. That there was no need of any express

change in the original contract to enable plaintiff to receive a delivery of the lumber at the mill, but the simple fact of a delivery there would itself work such a change (*Hill v. Mc-Donald*, 17 Wis., 101); that the mark on the lumber, its long detention at that place, its separation from all other lumber, its being charged to the plaintiff, the fact that the bill of such charge was exhibited to him, and a promise made to send him that bill when the clerk came back, the pointing out of the lumber to him as his lumber, the arrangement then made, with his assent, that a man should run it down the river for him, the dominion then immediately exercised over it by him in making provision for its sale or subsequent custody — all these and other facts testified to were proper evidence for the jury on the question of delivery. Story on Con., 2d ed., § 810, and cases there cited; *Bates v. Conkling*, 10 Wend., 391; *Douglass v. Garrett*, 5 Wis., 89; *Gallagher v. Bishop*, 15 id., 279. If the parties intended by their acts that the property should be deemed delivered, the title passed to plaintiff, even if Lally agreed, as is claimed, that his pilot should still run the lumber to Reed's Landing. The mere fact that something remains to be done by the vendor will not prevent the title from passing in such a case. *Morrow v. Reed*, 30 Wis., 87, 88; *Sewell v. Eaton*, 6 id., 490; *Kimberly v. Patchin*, 19 N. Y., 330. And even assuming that Saul & Lally were still bound by the terms of the contract to deliver the lumber at Reed's Landing, this does not show that plaintiff had not acquired title to the lumber. It is a general rule of the common law, that a mere contract for the sale of goods, where nothing remains to be done by the seller to ascertain the identity, quantity or quality, or to put the article in the condition which the terms of the contract require, before making delivery, transfers the right of property to the vendee, though the price has not been paid, and the thing has not been delivered. Chitty on Con., 8th Am. ed., 332; 2 Kent's Com., 496; Long on Sales, 42; Parsons on Con., 3d ed., 441; *Hanson v. Meyer*, 6

East, 614; *Simmons v. Swift*, 5 Barn. & Cress., 857; *Tarling v. Baxter*, 6 id., 360; *Olyphant v. Baker*, 5 Denio, 382–3; *Field v. Moore*, Lalor's Supp., 418; *Crofoot v. Bennett*, 2 N. Y., 259; *Joyce v. Adams*, 8 id., 291; *Terry v. Wheeler*, 25 id., 524; *Russell v. Carrington*, 42 id., 124–5. 2. That defendants were joint trespassers. They jointly received the profits arising from the conversion; and the act of *Potter* was within the scope of the partnership. His knowledge was the knowledge of all. Story on Part., 2d ed., 168 *a*. One who knowingly receives the benefit of a trespass, becomes a joint trespasser. Waterman on Trespass, § 66, and note. All partners are liable if the act was within the scope of the partnership, or if they afterwards adopted the act or its benefits. 1 Waterman, § 54; Story on Part., §§ 166–8; *Petrie v. Lamont*, Car. & M., 93; *Taylor v. Jones*, 42 N. H., 25; *McKnight v. Ratcliff*, 44 Pa. St., 156. And, the action being against all the partners jointly, and they having justified by joint answer, their plea is entire and indivisible, each has waived any defense peculiar to himself, and if one is liable all are. 1 Waterman, § 81; *Bradley v. Powers*, 7 Cow., 331; *Wales v. Hart*, 2 id., 426; *Merrill v. Near*, 5 Wend., 238; *Moors v. Parker*, 3 Mass., 311.

ORTON, J. This action is for the conversion of certain cribs of lumber by the defendants as copartners, and the answer admits the copartnership and denies all other allegations of the complaint.

It was in evidence, that, in the summer of 1876, the plaintiff contracted with the firm of Saul & Lally, operating a sawmill on the Chippewa River, to deliver them logs at their mill, to be sawed into lumber, and to be paid therefor at the rate of sixty per cent. of the product thereof, in merchantable lumber to be delivered at Reed's Landing on the Mississippi, opposite the mouth of said river. The plaintiff had delivered to Saul & Lally a large quantity of logs under this contract, and a part of them had been sawed into lumber before the 18th day

of September of that year, and then Saul & Lally, having met with reverses, failed in business and mortgaged all of their logs to the defendants, who were thereafter to stock said mill, and from that time the plaintiff was to look to them for the balance of the lumber coming to him in payment for said logs. At this time Saul & Lally had sawed, and put into the river just below their mill, seven cribs of lumber for the plaintiff, under said contract, and marked each crib with the name of the plaintiff, "*A. K. Fletcher,*" or with his initials, "*A. K. F.*," and had the same in readiness to be run down the river according to the terms of said contract. One McKinnon had been in the employment of Saul & Lally during that season, in running their lumber down the river to Reed's Landing, where it had been sold; and he had in his employment for that purpose a crew of men, among whom was one Patrick Holland as second pilot; and this pilot was to run these cribs down the river to Eau Claire, three miles below, there to be taken charge of by McKinnon, who was at that city at the time, and was making preparations so to do by making or repairing oars, and had receipted for the cribs, and had received a blank receipt, to be signed by the person who was to receive said lumber at Reed's Landing, but had not actually taken possession of the cribs with his men; and they were still in the place, tied up to the bank and undisturbed, where they were placed by Saul & Lally.

This was the condition of things when the plaintiff came to the mill, about the 20th day of that month. He had written to Saul & Lally at different times, to know whether his lumber was ready, and they had written to him that it was ready. When he came to the mill, he asked Lally, one of the firm, if his lumber had been manufactured, and Lally told him that it had been, and went with him down the bank of the river and showed him the cribs, which were in sight, and told him *that* lumber was manufactured for him and marked to him, and that the balance for any logs that were sawed there after the 18th

day of September, the defendants would pay for him, and that he would have to look to them for it, and not to Saul & Lally; and the pilot showed him the blank receipt. There was at the time something more due him than these cribs would pay. There was no other lumber mixed with this lumber in the cribs, and the amount of the lumber in the cribs was figured up between the plaintiff and Lally, and a bill of it was made out, in which it was charged to the plaintiff; and Lally told plaintiff that the pilot would run it down to Reed's Landing for him, the plaintiff, and deliver it to the watchman of the defendants; and plaintiff said "that was all right." On the same day, the plaintiff went to the office of the defendants and saw their bookkeeper, a Mr. Chamberlain, and told him to do with this lumber just as they did with their own at Reed's Landing, tie it up, and wait until the market was better, and then sell it just as they thought best. Very soon thereafter, Holland, the second pilot, ran the cribs down to Eau Claire, and delivered them, together with the blank receipt, to McKinnon, who tied them up to the bank near Eau Claire, and then attached the lumber as the property of Saul & Lally, upon their alleged indebtedness to him; and the cribs remained there tied up until after judgment in the attachment suit, and were then by the sheriff sold to McKinnon, who afterwards sold the same to *George A. Potter*, of the firm of *Ingram, Kennedy & Co.*, the defendants, and received payment therefor by a draft handed to him by the said Chamberlain, the bookkeeper of said firm.

The cribs were then run down the river in connection with other lumber of the defendants, and the steamer "Clyde," partly owned by them; and they went in to make up a raft not full, belonging to the defendants, and were sold at some point on the Mississippi river by them, at such rate that the cost of running it was saved, and part of the cost of running the other lumber, which made the profits of the purchase, and lessened by so much the expenses of said steamer.

This is substantially all the evidence material to be considered, and these are the facts which the jury may have found from all the evidence given on the trial; and upon the case thus presented, the following questions were raised and most ably argued by the learned counsel, upon this appeal:

1st. Do these facts show such a delivery of the lumber at the mill, by Saul & Lally to the plaintiff, as completely divested them of all property in it, and made the title to it perfect in the plaintiff, so as to be beyond the reach of the attaching creditors of Saul & Lally and subsequent purchasers from them?

2d. Do they show a good cause of action and right of recovery against all of the defendants as copartners?

Upon the first question, the numerous authorities cited and the able arguments made would have been of great benefit to the court in a more doubtful case. An unusually full statement of the facts has been made, in order to show the real character of this alleged delivery; and we think it is beyond all controversy or doubt, that the parties not only intended to make a delivery of this lumber at the mill, but did in fact perfect such delivery. It is true that the place of delivery designated in the contract was at Reed's Landing; but it was competent for the parties to change this place of delivery, and we think that the facts show that they did change it, and, in consequence of the embarrassed condition and failure in business of Saul & Lally, they notified the plaintiff to come and receive this lumber — which already equitably belonged to him — at the mill, in payment *pro tanto* of their indebtedness to him on the logs purchased. The lumber was set apart and marked with his name or initials, pointed out to him, examined by him, the amount computed, and a bill of it made out, in which it was charged to him; and he at once assumed control and exercised acts of ownership over it, by directing Chamberlain, the book-keeper of the defendants, as to its de-

livery to their watchman at Reed's Landing, and its disposition by sale.

It was certainly commendable, and by no means fraudulent, in Saul & Lally, to notify the plaintiff, to whom in justice and equity it belonged, to come and receive a delivery of this lumber at the mill before it should start on its way to Reed's Landing, when their failure in business and pecuniary embarrassments would be likely to invite attachments upon their property, and make their further possession of this lumber hazardous to the rights of the plaintiff; and it is most reasonable to presume, that the plaintiff, on his arrival at the mill, when he might have suspected, if he did not actually know, the true condition of things, had an anxiety commensurate with his interests, to secure this lumber as his only chance and hope of payment, before it should pass beyond his reach. These circumstances, in connection with what was said and done at the time, cannot be ignored in construing the acts and ascertaining the intention of the parties as to the delivery of the lumber.

Whatever may have been the decisions of other courts, applicable to other facts, in respect to what constitutes a delivery, the law upon the subject was well expressed in *Sewell v. Eaton*, 6 Wis., 490, and has been repeated and reaffirmed in numerous cases as applied to a great variety of facts since decided by this court, " that if it clearly appear to have been the intention of the parties that the property should be deemed to be delivered, and the title to have passed, and especially if their acts be inconsistent with any other view, the mere fact that something remains to be done will not govern such intention." *Sanborn v. Hunt*, 10 Wis., 437; *Godfrey v. Germain*, 24 Wis., 410; *Morrow v. Reed*, 30 Wis., 81; *Pike v. Vaughn*, 39 Wis., 500.

The objection taken, that these cribs of lumber, at the time of this transaction at the mill, had already passed into and were in the possession of McKinnon or his pilot as bailee, and

that neither McKinnon nor the pilot had notice of this alleged delivery, we think, is not well taken.  If, under the circumstances, either of them would in law have occupied the relation of bailee of the property, had he been in the actual possession of it, the evidence does not show that any such possession had been taken.  The receipts and making or repairing of oars were mere preliminary steps or preparation to take charge of the cribs, which were still tied to the banks where they had been placed by Saul & Lally and undisturbed, and the pilot knew that Saul & Lally and the plaintiff had them under consideration for some purpose, by their asking him for the exhibition of his blank receipt; and McKinnon, whose business it was to run lumber down the river for Saul & Lally, was not in the vicinity of the cribs, nearer than the city of Eau Claire.

To constitute a person a bailee of property, he must have such full and complete possession of it as to exclude, for the time of the bailment, the possession of the owner (Benj. on Sales, § 174), and he should have so far assumed the charge and control of the property as the sole custodian of it, as to be liable to the owner for any losses or damages occasioned by his neglect or fault in the manner in which he discharges his trusts in respect to it.  Story on Agency, §§ 200–204; Edwards on Bailments, § 4.  The old and still recognized definition of bailment is, " A delivery of goods in possession, and is either to keep or employ " (Finch's Law, b. 2, ch. 18); and such a full delivery of the property must have been made to the bailee, as to require a redelivery of it by the bailee to the owner, after the trusts of the bailment had been fully discharged.  Jones on Bail., 1.  It is very clear that no such possession of the cribs had yet been taken by either McKinnon or his pilot.  But the evidence does not show that McKinnon, in his general employment by Saul & Lally to run their lumber down the river, or his pilot working under him, was or would be, in any legal sense, a bailee of the lumber.  To make

a person a bailee in possession of property sold, so as to require notice to him to complete a delivery, there must be some special trust in respect to the property imposed upon him, and he must have some interest in or lien upon it for advances, charges or services, as in the case of a consignee, agent to sell, warehouseman or common carrier. Edwards on Bail., § 420. All of the elements, responsibilities, requisites and conditions of a bailment are wanting in this common employment of McKinnon or his men in doing service to Saul & Lally in running their lumber down the river.

McKinnon and his men were mere servants and employees of Saul & Lally to do a particular kind of labor in respect to their lumber and rafts, the same as their other hands and laborers, in respect to such lumber, in some stage of its manufacture or condition about the mill; and they could not properly be considered as their agents, general or special, and much less were they, in any sense, bailees of the property anywhere.

Authorities need not be cited to show that such mere servants or employees, by their casual or incidental manual possession, necessary to their service, of the property of their employer, could not affect or exclude the possession of the real owner, or that their possession, if any, is the possession of their employer or of the owner.

On the second question, of the liability of all the defendants, as partners, for the alleged conversion, it is at least doubtful whether they have placed themselves by their answer in an attitude to raise it. It is alleged in the complaint that the defendants were partners, and as such converted the property. The answer admits the copartnership, and is otherwise a general denial, which would seem to go only to the title of the property and conversion as charged.

As a general rule, if defendants are sued as partners, and do not deny the partnership, it is admitted; and if any question of the liability of the partnership is not in some way raised

by the pleadings, it is waived. *Cooper v. Blood,* 2 Wis., 62; *Robbins v. Deverill,* 20 Wis., 142. And when partners are sued for a joint trespass, and all join in a plea in bar, it will be good as to all, if to any one of them. 1 Waterman on Trespasses, § 81, and cases cited. But the evidence sufficiently shows that the purchase of this lumber was within the general scope of the partnership business. It was rafted and sold with the lumber of the firm, and paid for by and through the firm, and the firm business received the benefit and profits of the transaction; and it seems perfectly clear that, both in fact and law, it was a partnership transaction. In commercial dealings within the scope of the partnership, the acts of one partner are presumed to be for the benefit and in the interest of all the partners, whether present or absent, and bind the firm (Story on Part., §§ 102–104); and it is the mutual obligation of partners, and they are bound in good faith, not to deal as individuals and enter into private speculations on their own account and for their own exclusive benefit, in matters within the scope of their copartnership business. *In societatis contractibus fides exuberat.* Story on Part., § 172.

We have perhaps given more space and attention to the consideration of the questions raised in this case, than necessary, for the reason that the learned counsel on both sides, by their research and very able arguments, have dignified and given them importance.

RYAN, C. J. I concur in this judgment, not on the ground that the facts in evidence constitute an actual delivery, as matter of law, but on the ground that they were sufficient to go, and were fairly submitted, to the jury, on the question of the intent of the parties. If the acts of the parties show an intention on the one part to make delivery then and there, and on the other part to accept delivery then and there, the acts and the intent were sufficient to constitute a delivery, as a matter of fact. The verdict found this intent governing the

acts of the parties. And that is conclusive of the actual delivery.

*By the Court.* — The judgment of the circuit court is affirmed, with costs.