**SEIBERLING RUBBER COMPANY, Appellant,**

v.

**Leon REDNOR, Trustee in Bankruptcy of the Estate of Consumer Mart of America, Inc., dba C.M.A., Bankrupt, Appellee.**

No. 19538.

United States Court of Appeals Ninth Circuit.

April 20, 1965.

Rehearing Denied May 28, 1965.

---

Arthur T. Bridgett, Daniel N. Loeb, Schofield, Hanson, Bridgett, Marcus & Jenkins, San Francisco, Cal., Gordon B. Ambler, Jr., Akron, Ohio, for appellant.

Amil Ajamie, Richmond, Ajamie & Fay, Phoenix, Ariz., for appellee.

Before HAMLEY, Circuit Judge, MADDEN, Judge of the Court of Claims, and KOELSCH, Circuit Judge.

MADDEN, Judge:

This is an appeal from a decision of the United States District Court for the District of Arizona, in a Chapter 11 bankruptcy proceeding. See 11 U.S.C. § 701 et seq. The bankrupt is Consumer Mart of America, Inc., dba C.M.A. The appellant, Seiberling, filed, in the bankruptcy proceeding, a Petition for Reclamation of property which, Seiberling claims, belongs to it but is in the possession of the trustee in bankruptcy. The petition was opposed, hearings were held before a Referee in Bankruptcy, who denied the petition. Seiberling filed a Petition for Review of the Order of the Referee by the District Judge. The District Judge entered an order denying the petition and affirming the order of the Referee. Seiberling has appealed to this court from that decision.

C.M.A. owned a number of shopping centers in several states. It granted licenses to various types of businesses to locate and operate in these shopping centers. Seiberling, a manufacturer of rubber products, took six such licenses from C.M.A. licensing Seiberling to construct automobile service stations in six of C.M.A.'s shopping centers, located in California, Arizona, Illinois and Florida. The terms of the six licenses were identical. Each obligated Seiberling to construct and equip a service station at the shopping center designated in the license, and to make periodic payments to C.M.A. while the license was in effect. Each license provided that it was to be in effect for a specified term, but that either Seiberling or C.M.A. could terminate it "for any reason whatever." Each license agreement contained the following provisions:

"XV

"At the expiration of or prior termination of this agreement, any movable fixtures on the premises may be removed by Licensee."

\* \* \* \* \* \*

"XVII

"In the event either Licensee or Licensor elects to terminate this

agreement for any reason whatsoever prior to the expiration thereof or upon the expiration of this agreement according to its terms, Licensor shall purchase from Licensee (a) all of Licensee's inventory at Licensee's invoice cost or fair market value whichever is lower, and (b) all movable fixtures owned by Licensee and not removed by Licensee pursuant to the provisions of Paragraph XV hereof at Licensee's original cost less depreciation as reflected on the books and records of the Licensee or fair market value, whichever is lower, and (c) all improvements to the premises necessary to the operation of a service station such as buildings, pumps, tanks and other similar nonmovable fixtures whether deemed real estate or personal property, such purchase to be made at original cost less depreciation as reflected on the books and records of Licensee or fair market value, whichever is lower.

"If a sublicensee or sublessee has been approved by Licensor under the provisions of Paragraph XIII hereof, the term 'Licensee' shall be deemed to include such sublicensee or sublessee, with respect to the obligation of Licensor to repurchase.

"Payment therefor shall be made by Licensor to Licensee within six (6) months after the expiration of termination of this agreement. In the event there are existing encumbrances, Licensor shall assume the same and shall pay Licensee only the difference thereof."

Seiberling constructed the six service stations provided for in its licenses. It operated four of them, and made sublicense agreements, as it had the right to do, with Mr. Barnblatt for the operation of the other two stations. By telegram and letter dated November 6, 1962, to C.M.A., Seiberling elected to terminate its licenses effective January 6, 1963. The termination date was, by mutual agreement, postponed to January 31, 1963.

Before January 31, 1963, Seiberling commenced removal of certain property from at least one of its stations. C.M.A., learning of this activity, sent a telegram to Seiberling on January 29 ordering it to cease all removals from the stations. Following discussions, counsel for the parties agreed that Seiberling would return all "bolted down" items that had been removed and would make no further removals of bolted down items, but that the return of removed items and the refraining from further removals should not prejudice Seiberling's right to subsequent removals. This latter arrangement was important because the licenses required, or might be interpreted to require, removals before Seiberling surrendered possession of the stations, which it did on January 31.

As we shall learn, no further removals were made by Seiberling, the time being occupied in discussion and negotiation between the parties. On October 10, 1963, C.M.A. filed its petition in the bankruptcy court. It then, of course, became highly important to Seiberling whether it still owned certain of the property or had only a claim against C.M.A. for its value.

We now consider the text of the license agreements, pertinent parts of which are quoted above. It is apparent from paragraph XVII that C.M.A. regarded it as so desirable to have automobile service stations established in its shopping centers that it was willing to obligate itself to buy from its licensee, when the licenses expired or were terminated, the constructed stations and everything that the licensee had in and about the stations. The language of the license agreement, reasonably interpreted, also imposed upon the licensee Seiberling the obligation to sell to C.M.A. whatever it had in and about the service stations, except that paragraph XV of the writing said:

"At the expiration of or prior termination of this agreement, any movable fixtures on the premises may be removed by Licensee,"

and provision (b) of paragraph XVII, relating to "movable fixtures," obligated the licensor to buy and the licensee to sell only "all movable fixtures owned by Licensee and not removed by Licensee pursuant to the provisions of Paragraph XV hereof * * *"

The problem in the instant case is whether, at the time C.M.A. went into bankruptcy, Seiberling was the owner of property, tangible things, or was the owner only of a chose in action, a claim against C.M.A. for the purchase price of things, the ownership of which had passed to C.M.A. pursuant to the license agreements. In the language of the law of Sales, had title passed or had it not?

■ The agreement provides in paragraph XVII that upon termination of the license "Licensor shall purchase." As we have said, that must also mean that the licensee shall sell. The agreement provided for payment by the licensor within six months of termination. Payment was not, therefore, intended to be a condition precedent to the passage of title. Upon termination, Seiberling vacated the stations, and they were in the possession of C.M.A. We have, then, the elements of the arrival of the time of consummation of the sale, the possession of the subject matter by the purchaser, and the fact that payment was intended to be deferred. These are strong indicia that title had passed. We defer, for the moment, the discussion of the parties' January, 1963, agreement that Seiberling's non-removal of "movable fixtures" should be without prejudice to his right later to remove them.

■ Seiberling says that, in spite of the indicia that a sale had been completed, which indicia we have recited above, there still could not have been a completed sale, and for three reasons: (1) the property of which title was supposed to have passed was not identified, (2) the price which C.M.A. was to pay for the property was not determined, and (3) the intention of the parties was that title was not to pass.

Neither of the first two contentions is valid. As to (1), the parties, in paragraph XVII of the license agreement, attempted to identify the three classes of property. In (a) they provided for the "inventory." That would have meant the gasoline, oil, batteries, tires and the many things which a service station keeps for sale. In (c) they provided for

"all improvements to the premises necessary to the operation of a service station such as buildings, pumps, tanks and other similar nonmovable fixtures whether deemed real estate or personal property * * *"

It is obvious that in (b), relating to "movable fixtures," and in paragraph XV giving the licensee the right to remove such property before or at termination, the parties meant such property as was not included in the more easily identifiable subject matters of (a) and (c).

The fact that the parties, at the time of termination, disagreed as to the proper interpretation of the term "movable fixtures" in (b) and in paragraph XV does not mean that the term had no ascertainable meaning, that if one of the parties, when the time for performance arrived, said that it meant one thing and the other party said it meant something else, no arbitrator or judge or jury could rationally conclude that one was right and the other wrong, or that each was partly right and partly wrong, or that both were wrong and their agreement meant something for which neither party contended. Disagreements as to the interpretation of contracts, including disagreements as to the subject matter covered by contracts, are common subjects in contract litigation. And the fact that the parties disagree as to the interpretation of a contract does not mean that they do not have, and never did have, a contract at all, as Seiberling contends. It means that they will have to compromise their difference, if they can, or submit the question to an arbitrator, or one of them will have to take the problem to court.

If it were our task, which it is not, to determine what the parties mean by the term "movable fixtures" in the (b) portion of paragraph XVII and in paragraph XV, we would be greatly helped by the language of the (c) portion of paragraph XVII. In (c), the language "all improvements to the premises necessary to the operation of a service station such as buildings, pumps, tanks and other similar nonmovable fixtures" would seem to be helpful. If the gasoline pumps are expressly nonmovable, a grease-rack lifted by air pressure installed under the floor would seem to be "similar" and to be equally "necessary to the operation of a service station." C.M.A.'s interpretation, at the time the controversy first arose, was that equipment that was bolted down was nonmovable within the meaning of (c).

Seiberling's second argument is that title did not and could not pass to C.M.A. because the price which C.M.A. was to pay was unascertained. As we have said, this contention is without merit. In paragraph XVII, as to each class of things which the parties agree to buy and sell, there is a provision as to how the price is to be determined. In (b) and (c) the price was to be the licensee's original cost less depreciation as reflected on the books and records of the licensee, or fair market value, whichever is lower. These figures are objective and ascertainable by proof. The fact that the parties to the contract do not agree is, as was the situation with regard to what things were removable, the frequently occurring situation in which compromise, arbitration, or a lawsuit will be necessary to resolve the difficulty. But again, the fact that parties have a lawsuit about a contract does not prove that there is no contract.

Seiberling urges that, even if its contentions that title could not have passed because of uncertainty of subject matter and uncertainty of price are rejected, which they are, still title did not pass because the parties did not intend that it should pass. One piece of evidence relied on by Seiberling in this con-

nection is substantially a repetition of the argument about the uncertainty of the price. It is said that it would take time to determine cost less depreciation and then determine market value, and then compare the two to see which was lower. But these goods were not to be paid for upon delivery. Payment was not due until six months after Seiberling had completely turned over the property to C.M.A., which could do exactly what it pleased with it except as to the "movable fixtures," as to which, as we have seen, Seiberling was permitted to reserve its rights. There is no more reason to infer that the parties intended that title should not pass until the term of credit had expired or until the goods were paid for than there would be reason for such an inference in any of the countless sales on credit which occur daily.

Seiberling points to expressions of Mr. Gaines, one of C.M.A.'s lawyers, indicating that he thought that title did not pass to C.M.A. upon termination of Seiberling's license. One of these occasions was when Gaines was trying to collect past due license payments from Seiberling and Seiberling was holding on to its money, probably because it suspected that when the time came for C.M.A. to pay Seiberling the large sum which it would owe at the end of the six months period of credit C.M.A. would have no money. Another occasion was when the Arizona county in which one of the stations was located was threatening to attach the station for unpaid taxes and Seiberling and C.M.A. were each trying to get the other to pay the taxes. Then there was negotiation with another potential licensee to take Seiberling's place in some of the stations, and some of the discussion indicated that if this person would pay Seiberling, so that C.M.A. would not have to pay Seiberling, that would be a solution. We have considered all the evidence of this kind, presented by Seiberling to show an intent of the parties that title should not pass or had not passed. We find such evidence casual and incidental and not demonstrative of any agreed conclusion that the legal status of

the parties was different from that in which their contract and the applicable legal rules seem to us to have placed them.

It may be that Seiberling, under paragraph XV and provision (b) of paragraph XVII of its license and the reservation which it was allowed to make in the January, 1963, exchange of views, actually had the right to remove some things which in fact it has not removed. But Seiberling, in its Petition for Reclamation and in the trial, made only its broadside attack upon the license agreement and their sections XVII in their entirety, and claimed the right to remove everything, the buildings and everything in and around them for the unsupportable reasons which we have rejected in this opinion.

■ The Referee in Bankruptcy and the District Judge, being given no basis for determining whether any particular items of property were properly removable by Seiberling, could not do other than what they did, which was to deny Seiberling's Petition for Reclamation.

The judgment is affirmed.