SOUTHERN FIRE & CASUALTY
COMPANY, Plaintiff,

v.

James Lawrence TEAL, Jr., Mrs. Ruth
Teal, Glover Oldsmobile, Inc., and Glens
Falls Insurance Company, Defendants.

Civ. A. No. 66–465.

United States District Court
D. South Carolina,
Spartanburg Division.

Aug. 14, 1968.

**618**

George F. Abernathy, Odom, Nolen & Foster, Spartanburg, S. C., for plaintiff.

James J. Raman, Spartanburg, S. C., for defendants James Lawrence Teal, Jr. & Mrs. Ruth Teal.

Rufus M. Ward, Ward, Howell & Barnes, Spartanburg, S. C., for defendants Glover Oldsmobile, Inc. & Glens Falls Ins. Co.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

DONALD RUSSELL, District Judge.

This suit for a declaratory judgment under Sections 2201, 2202, 28 U.S.C.A. seeks to resolve the ownership of an automobile involved in an accident and, as a consequence thereof, the liability, as between the two insurance carriers of the parties to the dispute of ownership, for the defense and settlement of the claims arising out of the operation of such automobile at the time.

The matter in litigation represents a real and justiciable controversy within the intendment of the Declaratory Judgment Act, between citizens of different states, over liabilities in an amount of over $10,000, exclusive of any interest or costs. The plaintiff corporation is chartered under the laws of Tennessee. The corporate defendants were created under the laws of states other than Tennessee and the individual defendants are all residents of South Carolina. Under such circumstances, jurisdiction in this Court is admitted. Stout v. Grain Dealers Mutual Insurance Company (C.C.A. 4 1962) 307 F.2d 521, 523; C. Y. Thomason Co. v. Lumbermens Mutual Casualty Co. (C.C.A. 4 1950) 183 F.2d 729, 733.

The action arises out of an alleged exchange of a truck for the car in question had between the defendants Teals and the defendant Glover Oldsmobile, Inc., though their insurance carriers, rather than they, are the real parties to this controversy. The plaintiff is the carrier of the Teals, who admittedly had possession of the offending car at the time of the accident and who, according to the contention of the defendant carrier, were the then owners of such car. The defendant carrier provides liability coverage to Glover Oldsmobile, Inc., an automobile dealer, which, according to the position of the plaintiff, retained ownership of the offending car, though it had entrusted possession to the Teals under circumstances that give rise to the dispute over ownership.

It is conceded by the parties that, if title to the offending car was in the Teals at the time of the accident, liability for any damages on account of the accident properly fell on plaintiff. On the other hand, if Glover Oldsmobile, Inc., retained title, the defendant carrier, unless absolved by certain exclusionary clauses in its policy, would be liable, in whole or in part, for such damages.

Ownership of the offending car is thus the basic issue.

The facts surrounding the issue of ownership are relatively free from dispute in the record. On Friday night, March 11, 1966, James Lawrence Teal, Sr., and his wife attended an automobile show at the Spartanburg (South Carolina) Auditorium. While there, they visited the booth of the local franchised Oldsmobile dealer, Glover Oldsmobile, Inc., and discussed with the latter's sales manager, one Baker, a possible trade for a used Oldsmobile car. The car under consideration was parked behind the Auditorium. Mr. Baker took the Teals to the car and provided both of them an opportunity to drive the car. The Teals stated that if they purchased, they would want to "trade in" on the purchase price a truck, which was owned by them and at the time was registered in the name of Mrs. Teal. After some inquiries about the truck, the sales manager offered to trade the used car for the truck plus a cash payment of $1,300, to be financed. It was understood at the time that there was a chattel mortgage held by GMAC on the truck and the balance due on such chattel mortgage was to be added to the $1,300 and the two sums financed through GMAC. The Teals stated to Mr. Baker that they wanted to consider the proposed trade.

The Teals walked about the auditorium for "a few minutes", talked over the proposed trade, decided that "it looked like a good deal", and determined, by their own statement, "that we (they) would go ahead and take it." Returning to Glover's booth, they told Baker that they had decided to take the deal. Mr. Baker advised them that immediately after the show closed at nine o'clock, he would meet them at the showroom of Glover Oldsmobile, Inc., where the trade could be completed and an exchange of car for truck made. The Teals went to their home, got their pickup truck and its license registration card (the only evidence of ownership they had), and met Baker at the showroom as agreed. Exchange of delivery was made between the parties, including the delivery to Baker of the license registration card for the truck. The offices of GMAC were closed for the weekend and it was impossible to secure the balance due on the truck for inclusion in the sales agreement and chattel mortgage to be executed by the Teals. It was understood between the parties that this balance would be secured on the Monday following and a sales agreement and chattel mortgage in favor of GMAC would then be executed by the Teals, including such balance. The only feature of the chattel mortgage that was uncertain at that time was the balance due GMAC on the truck. There was no dispute over the monthly payments to be provided in the chattel mortgage. The sole uncertainty was an amount which was subject to exact ascertainment from GMAC; and both parties intended to abide by such ascertainment. That this was so is conclusively attested by the fact that the chattel mortgage subsequently executed by the Teals conformed to such ascertainment. At that time, there was no dispute over the amount of the chattel mortgage after the balance due on the truck was obtained from GMAC; there was no dispute about the monthly payments included by the vendors; there was no dispute over any term included in the chattel mortgage.

It is clear, therefore, that the parties on the evening of Friday, March 11, 1966, had reached agreement upon the terms of the chattel mortgage except for the amount then due GMAC on the truck, an amount to be secured on Monday morning from GMAC. In the meantime, however, and as an interim arrangement, Baker prepared a sales agreement and chattel mortgage covering the transaction, in which the monthly payments and face amount were left blank, and Mrs. Teal signed this. The purpose of this interim arrangement, as explained by the Teals, was to assure that "in case somebody ran into us on the way home we (the Teals) would be covered with insurance." In other words, this arrangement was resorted to

in order to avoid this very controversy and to make sure that the Teals' liability insurance attached to the car from that moment on. Following this, Baker told Mr. Teal "the Olds was (is) now my (your) wife's." The Teals returned home, told their married son, who, with his family, had come from their home to visit his parents, that they had purchased the car and that, since his own car was being repaired, authorized "him to drive it over the weekend."

On Saturday following, the son, while driving the car, was involved in an accident, as a result of which the car was severely damaged and the damage suits around which this action revolve arose. The son advised the officers investigating the accident that the car was owned by his parents. This was, of course, based on what he had in turn been told by them. Although Mr. Teal conceded that "verbally" he and his wife "had bought" the car on the previous Friday night, he returned to Glover Oldsmobile the Monday subsequent to the accident and "verbally disagreed", to use his term, that he had purchased the car on Friday night. He claimed that since the formal agreement had not been filled out and signed, neither he nor his wife was bound. He explained his action in these words:

> "I felt sure that the monthly payment would be agreeable. The only thing I had in my mind is that I knew that no forms had been filled out, no agreement had ever been reached and signed no paper, and I told him Monday morning when I went back around there that I would not take the car now."

Subsequently, however, the Teals' collision insurer [1] paid the collision loss sustained by the car, less a deductible of $100, which was absorbed by Glover Oldsmobile, and the car was repaired by Glover Oldsmobile. The Teals then accepted the car and executed the chattel mortgage in favor of GMAC, as prepared by Glover Oldsmobile, for balance due. As has been pointed out, there was no controversy over, or even any discussion about, the amount, terms or any other provisions of the chattel mortgage so prepared by Glover Oldsmobile.

The real question in issue, as I have observed, is whether responsibility in the damage suits arising out of the accident occurring on Saturday falls on the insurance carrier of Glover Oldsmobile, Inc., or that of the Teals. This, in turn, will be determined, it is conceded by the parties, by the resolution of the issue of ownership of the car at the time of the accident.

■■ Under the law of South Carolina, which is controlling in this situation (Angelo v. Lamborn, C.C.A. 4 1924, 2 F.2d 854, 855; Russell v. Tunno, 1858, 11 Rich. 303, 312;) a sale of personal property is complete and "Change of title takes place when the bargain is struck", Pregnall & Bro. v. Miller & Kelly (1884) 21 S.C. 385, 392; Hassler Sales Agency v. Shaw (C.C.A. 4 1924) 295 F. 854, 856 (rev. on other grounds, R. H. Hassler, Inc. v. Shaw, 271 U.S. 195, 46 S.Ct. 479, 70 L.Ed. 900). Whether a bargain has been "struck" and passage of title had is a matter of the intention of the parties. S. C. Tax Comm. v. Schafer Distributing Co. (1966) 247 S.C. 491, 496, 148 S.E.2d 156. The rule is phrased in 46 Am.Jur., sec. 413, p. 585:

> "The cardinal factor, according to both the Uniform Sales Act and the common law, upon which the passing of title between a seller and buyer depends is the intention of the parties. The Uniform Sales Act provides that where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred, and that for the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties,

---

[1]. The collision insurer of the Teals was not the plaintiff.

usages of trade, and the circumstances of the case."

Delivery of possession is strong, if not conclusive evidence of such an intention. As the Court said in Lynch v. United States Branch, Gen. Acc. F. & L. Assur. Corp. (C.C.A. 4 1964) 327 F.2d 328, 330, quoting from 5 Williston on Contracts, section 733 (Emphasis added):

"A delivery to the buyer with authority to use the goods immediately should be *conclusive evidence* of transfer of the property in the absence of clear evidence showing an intention to reserve the title."

46 Am.Jur., sec. 433, p. 602, puts the same rule thus:

"The actual delivery of the goods is of the greatest importance as evincing an intention to pass title. If unaccompanied by an explanation or the specification of any condition, the buyer generally has a right to regard it as passing title. A fortiori, if there is an accompanying declaration showing an intention to pass the property to the buyer immediately and not at some future time, the fact of delivery, as evidence of intention, becomes manifestly the most cogent of all legal proofs, where the good faith of the transaction is not impugned for fraud."

The mere fact that such delivery was not accompanied by compliance with the South Carolina Title Certificate law cannot alter the result or prevent the passage of title. St. Paul Fire and Marine Insurance Co. v. Boykin (1968) S. C., 161 S.E.2d 818, 821; Grain Dealers Mut. Ins. Co. v. Julian (1965) 247 S.C. 89, 99, 145 S.E.2d 685.

And if the intention to contract, to make a trade, to effect a completed sale is clear, such intent will not be frustrated by the fact that some calculations, especially if the formula for such calculation is understood, remain. In fact, Section 10.2–204 of the Uniform Commercial Code as adopted by South Carolina provides specifically that, "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." It is true that such Commercial Code only applies to contracts of sale made after January 1, 1968, but the principle stated therein is in accord with the modern rule, as phrased by Corbin in his treatise on Contracts:

"If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." Corbin on Contracts, Contract of Sale of Personalty, vol. 1, p. 400.

And this statement from Corbin is amply supported by the language of the Court in State v. Small (1908) 82 S.C. 93, 96, 63 S.E. 4, 44 L.R.A.,N.S., 454, quoting from Fletcher v. Ingram, 46 Wis. 191, 201, 50 N.W. 424:

" 'If it clearly appears to have been the intention of the parties that the property should be deemed to be delivered, and the title to have passed, and especially if their acts be inconsistent with any other view, the mere fact that something remains to be done will not govern such intention.' "

It, also, accords with the rule that, "The law does not favor, but leans against, the destruction of contracts because of uncertainty." Haggerty v. Warner (1953) 115 Cal.App.2d 468, 252 P.2d 373; Fifer v. Hoover (1933) 163 Md. 381, 163 A. 848.

If the contract is silent on price, for instance, the agreement is not indefinite if a formula or method for ascertaining the price is understood and agreed upon. McJunkin Corp. v. North Carolina Natural Gas Corp. (C.C.A. 4

1962) 300 F.2d 794, 796–797, cert. denied 371 U.S. 830, 83 S.Ct. 43, 9 L.Ed.2d 68; Seiberling Rubber Company v. Rednor (C.C.A. 9 1965) 345 F.2d 23, 27; A. M. Webb & Co. v. Robert P. Miller Co. (C.C.A. 3 1946) 157 F.2d 865, 867. Nor will a contract fail for indefiniteness when the gaps that the parties have left "may be implied from custom and usual forms and former course of dealing." Carolina Aviation, Inc. v. Glens Falls Ins. Co. (1949) 214 S.C. 222, 230, 51 S. E.2d 757, 761. Moreover, the subsequent action of the parties, such particularly as the acceptance of the "gaps" as expressed by the other party, may give the required definiteness to the agreement and establish sufficiently the intention of the parties. Bondy v. Harvey (C.C.A. 2 1933) 62 F.2d 521, 522–523, cert. denied 289 U.S. 740, 53 S.Ct. 659, 77 L.Ed. 1487. Generally speaking, it is only when the "gaps" are intended to be the subjects of future negotiations and the intention of the parties is that a completed contract shall await the completion of such negotiations that the contract will fail for indefiniteness; otherwise, the Courts will apply the rule of custom and reason in filling in the "gaps". California Lettuce Growers v. Union Sugar Co. (1955) 45 Cal.2d 474, 289 P.2d 785, 49 A.L.R.2d 496, 503.

Laveson v. Warner Mfg. Corp. (D.C. N.J.1953) 117 F.Supp. 124, illustrates the application of the foregoing principles. In that case, one of the parties to an alleged contract of sale sought to void the sale for indefiniteness of price. In overruling such plea, the Court said that "the parties did subsequently agree upon prices, and have never had any difficulty or disagreement concerning them. In fact, the present controversy apparently is not caused by any question of price. Warner is attempting to escape the binding force of an agreement which it entered into with the full intention of making a contract. Warner's attempted justification is the legal technicality that the provisions of the agreement as to price are too vague to permit the existence of a contract. Neverthe-

less, this allegedly 'vague' provision has been satisfactorily applied by the parties for a period of three years. It is the duty of the Court to effectuate the intentions of business men, not to block them, and that is the intent of the above provision of the Uniform Sales Act." p. 127.

Ouston v. Scammell (1940) 1 All Eng. 59 (C.A.) bears considerable similarity to the instant case. There, an agreement of sale was had, involving the delivery of a new truck in exchange for a used truck and a cash balance to be paid in accordance with a "hire-purchase" agreement, to be negotiated with a finance company. The Court sustained the sale against a charge of indefiniteness, holding the "hire-purchase" agreement was such as was reasonable and customary. It is true that this decision was reversed by the House of Lords (Scammell v. Ouston (1941) 1 All Eng. 140) but the original decision is approved by Corbin, supra, p. 405, note 12.

Fidelity & Casualty Company of New York v. Frazier (D.C.N.C.1961) 193 F. Supp. 443, largely parallels this case factually. There, an automobile dealer agreed with a customer-buyer upon a trade of cars. The buyer was to trade in his car and pay a cash balance, to be financed. The purchaser was a minor and the "financing papers" were to be executed by his father. Delivery was had between the parties, but, *as here*, the necessary financing papers were not executed by the father. On Sunday following, the car purchased was involved in an accident. *As here*, the insurance carrier of the purchaser sought to deny liability to defend on the ground that the title had not passed, since the necessary "financing papers" had not been signed. The Court held that title had passed and that the liability insurer of the purchaser should bear the costs of defending and settling any damage claims arising out of the operation of the car.

 In this case, there can be no dispute that the parties intended a completed sale or that they struck a bargain

on Friday night. Baker affirmed that there was a sale then. Teal testified they had "agreed" at such time. In affirmance of such sale and by way of completion thereof, they exchanged delivery, without any reservations. Baker told the Teals the car was theirs. They executed interim papers to attest such ownership so that the Teals' liability insurance would attach to the car's operation—an act, incidentally, intended to avoid this very controversy. The Teals delivered to Baker not merely their truck but also the only evidence of title, i.e., the registration card, they had. After receiving the car, the Teals proceeded to turn it over to their married son for his use, assuring him the car was theirs. Every act of the parties was thus consistent solely with the conclusion that ownership of the car passed on Friday night to the Teals.

It was after the accident and after the car was severely damaged that the Teals, to use their own words, determined to "verbally disagree". But even that verbal disagreement was adopted only as an excuse, and a technical one at that, to secure help on the repair bill for the damaged car. It is true that the Teals based their "disagreement" on the fact that the financing papers had not been signed. But, when the Teals' own collision insurer agreed to pay the repair bill less its $100 deductible, which Baker agreed to absorb, the Teals withdrew their "disagreement" and signed the financing papers as they had been prepared by Baker without any question or claim of indefiniteness or misunderstanding and without any discussion of any of the terms thereof.

The carrier for the Teals contends that on Friday night the terms of the chattel mortgage were not fully agreed upon nor had GMAC agreed to accept the chattel mortgage. It urges that both of these facts render the sale incomplete. It may be, as the plaintiff argues, the specific terms of the chattel mortgage were not discussed on Friday night. Neither do they appear to have been discussed later when the chattel mortgage was actually signed. The parties assumed that the terms would be the customary ones charged by GMAC. All the parties were interested in were the monthly charges and the full amount of the Teals' cash payment. These could not be calculated until the balance due by the Teals to GMAC on the truck could be secured from GMAC. If the parties could have secured that balance from GMAC, all the papers could have been signed on Friday night, since as Mr. Teal testified, he knew "the monthly payment would be agreeable". The mere fact that these amounts could not be secured until the following Monday did not render the agreement too indefinite for enforcement; the method for their calculation (i.e., securing from GMAC such balance) was agreed upon.

Actually, the specific points raised by the carrier for the Teals were never raised by the Teals. They never represented the bone of contention between Glover and the Teals. The Teals were accustomed to doing business with GMAC. They apparently understood the terms on which GMAC extended financing. They were content with those terms. The only controversy between the real parties to the sale dealt with payment for the damages to the car. When the Teals' own insurer accepted liability for such damages, except for its deductible and Glover took over the deductible, the Teals abandoned any effort on their part to "disagree" and executed as they had been prepared by Glover the necessary financing papers. And GMAC accepted the paper.

The Teals intended to purchase and Glover intended to sell them the car in question on Friday night. That intention was abundantly evidenced by the conduct of the parties. Such intent will not be frustrated by any technical attempt by the insurance carrier to read a disagreement or an indefiniteness into an arrangement thoroughly understood and agreed upon by the parties themselves.

Plaintiff cites in support of its position Stovall Realty & Insurance, Inc. v. Goff (1968) 117 Ga.App. 94, 159 S.E.2d 467. That case, which was decided on the pleadings and involved an attempt to recover broker's commissions, involved a contract to sell realty and was made subject to the ability of the prospective buyer to secure a satisfactory loan. It is true the complaint alleged that a loan on terms such as the defendant demanded was subsequently secured but the Court points out, and this is the heart of its opinion, that the complaint did not allege that the buyer had secured such loan *"at the time it (the sale contract) was sought to be enforced."* And in Sheldon Simms Company v. Wilder (1963) 108 Ga.App. 4, 131 S.E.2d 854, 855, one of the cases cited and distinguished in the *Stovall* Case, the Court said: "Nor was the contract (for the sale of real estate) void, as contended by the plaintiff because the terms of the loan to be procured were not definite." Such conclusion is at variance with the plaintiff's contention in this case. The *Stovall* Case, whether considered in connection with its own language or with the authorities it cites, is thus of no comfort to the plaintiff.

I am of opinion that the liability properly was assumed by the plaintiff and it is not entitled to any recovery of the defendant Glens Falls Insurance Company.

It is unnecessary, under these circumstances, to consider the issues posed by the exclusion clauses in the policy of the defendant Glens Falls Insurance Company.

The foregoing shall constitute findings of fact and conclusions of law, in compliance with Rule 52(a), Rules of Civil Procedure.

Let order of judgment be entered that the defendant Glens Falls Insurance Company is free of any liability on account of the accident involved in this proceeding.

And it is so ordered.